1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11  DESERT PROTECTIVE COUNCIL, a California nonprofit corporation; | CASE NO. 12cv1281-GPC(PCL) |
| 12  LABORERS' INTERNATIONAL UNION OF NORTH AMERICA LOCAL UNION | |
| 13  NO. 1184, an organized labor union; HECTOR CASILLAS, an individual; and | |
| 14  JOHN NORTON, an individual, | **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY** |
| 15                              Plaintiffs, | **JUDGMENT AND GRANTING FEDERAL DEFENDANTS' AND** |
|          vs. | **OCOTILLO DEFENDANTS'** |
| 16 | **MOTION FOR SUMMARY JUDGMENT; DENYING** |
| 17 | **PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED** |
| 18 | **COMPLAINT** |
| 19  UNITED STATES DEPARTMENT OF THE INTERIOR; KEN SALAZAR, Secretary, | |
| 20  U.S. Department of the Interior; UNITED STATES BUREAU OF LAND | [Dkt. Nos. 80, 83, 84, 93.] |
| 21  MANAGEMENT; ROBERT ABBEY, Director, U.S. Bureau of Land Management; | |
| 22  TERI RAML District Manager, BLM California Desert District; MARGARET | |
| 23  GOODRO, Field Manager, BLM El Centro Field Office; COUNTY OF IMPERIAL, | |
| 24  CALIFORNIA; BOARD OF SUPERVISORS OF THE COUNTY OF IMPERIAL; | |
| 25  OCOTILLO EXPRESS LLC, a wholly-owned subsidiary of PATTERN ENERGY | |
| 26  GROUP LP, a Delaware Limited Partnership; PATTERN ENERGY GROUP LP, a | |
| 27  Delaware Limited Partnership, | |
| 28                              Defendants. | |

On May 25, 2012, Plaintiffs filed a complaint against Defendants. (Dkt. No. 1.) On August 3, 2012, Plaintiffs filed an amended complaint challenging the United States Department of the Interior's approval of the May 11, 2012 Record of Decision ("ROD") approving the Ocotillo Wind Energy Facility Project ("OWEF" or "Project"), a utility-scale wind power project in the Sonoran Desert in Imperial County, California. (Dkt. No. 28.) Plaintiffs challenge BLM's grant of a right-of-way ("ROW") for the Project and the Plan Amendment to the California Desert Conservation Area ("CDCA") permitting the Project. (Id.) On December 28, 2012, Plaintiffs filed a revised motion for summary judgment. (Dkt. 80.) On January 4, 2013, Federal Defendants and Defendants Pattern Energy Group, LP and Ocotillo Express, LLC filed an opposition and their cross-motions for summary judgment. (Dkt. Nos. 83, 84.) On January 18, 2013, Plaintiffs filed their reply and opposition to all Defendants' cross-motion for summary judgment. (Dkt. No. 88.) On February 1, 2013, all Defendants filed their reply to their cross-motions for summary judgment. (Dkt. Nos. 96, 98.)

In addition, on January 22, 2013, Plaintiffs file a motion for leave to file a second amended complaint. (Dkt. No. 93.) Federal Defendants filed an opposition on February 8, 2013. (Dkt. No. 100.) Plaintiffs filed a reply on February 13, 2013. (Dkt. No. 101.)

A hearing on the cross motions for summary judgment was held on February 22, 2013. (Dkt. No. 104.) Michael Lozeau, Esq. appeared on behalf of Plaintiffs Laborers' International Union of North America Local Union No. 1184, Hector Casillas and John Norton; and Laurens Silver, Esq. appeared on behalf of Plaintiffs Desert Protective Council, Jim Pelley, and Parke Ewing. Marisa Piropato, Esq. and Luke Miller, Esq. appeared on behalf of Federal Defendants. Svend Brandt-Erichsen, Esq. and Nicholas Yost, Esq. appeared on behalf of Ocotillo Defendants. After a thorough review of the administrative record, the applicable law, the parties' briefs, and hearing oral argument, the Court DENIES Plaintiffs' motion for summary judgment; GRANTS all Defendants' motions for summary judgment; and DENIES Plaintiffs' motion for leave to file a second amended complaint.

### Summary

Plaintiffs filed an amended complaint alleging violations of the National Environmental Protection Act, ("NEPA"), and the Federal Land Policy and Management Act ("FLPMA") under the Administrative Procedures Act ("APA"). They contest the availability of scientific studies to the

public, the scientific integrity underlying the FEIS/FEIR and argue that turbine curtailment should be applied to all raptors.  Under FLPMA, Plaintiffs, under different theories, essentially seek an order from the Court requiring the BLM to avoid the killing of any raptor or owl for the Project.

The Court's role in an APA case is to determine whether the BLM's approval of the ROD and grant of the ROW was arbitrary, capricious or an abuse of discretion."  5 U.S.C. § 706(2)(A).  This is a highly deferential standard where the agency's action is presumed to be valid as long as there is a reasonable basis for its decision.  Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007).

As it relates to the issues in this case, the BLM conducted a thorough review of the potential impacts on birds, bats and golden eagles.  BLM conducted numerous studies and surveys by experts over a several year period, it consulted and coordinated with other federal and state agencies, it addressed compliance with federal and state standards, it addressed comments during the public comment period, and adopted mitigation measures, such as the Burrowing Owl Migration and Monitoring Plan, Golden Eagle Conservation Plan, and the Avian and Bat Protection Plan, to avoid or substantially reduce the impact of the Project.

Based on an in-depth review of the administrative record and the parties' briefs, the Court finds that the BLM's decision to grant the ROW and approve the ROD was reasonable as it considered all relevant factors and provided an analysis that presented a rational connection between the facts found and the conclusions it made based on relevant law.  Therefore, the Court concludes that the BLM's decision to grant the ROW and approve the ROD was not arbitrary, capricious or an abuse of discretion.

**Procedural Background**

On August 3, 2012, Plaintiffs Desert Protective Council; Laborers' International Union of North America Local Union No. 1184 ("LIUNA"); Hector Casillas; John Norton; Jim Pelley; and Parke Ewing filed a first amended complaint against Defendants United States Department of the Interior ("Interior"); United States Bureau of Land Management ("BLM"); Ken Salazar, Secretary of the Interior; Robert Abbey, Director, U.S. Bureau of Land Management; Teri Raml, District Manager, BLM California Desert District; Margaret Goodro, Field Manager, BLM El Centro Field Office

(collectively referred to as "Federal Defendants"); Ocotillo Express, LLC, a wholly-owned subsidiary of Pattern Energy Group LP; and Pattern Energy Group, LP ("Ocotillo Defendants").  (Dkt. No. 28.) Plaintiffs allege violations of the Administrative Procedures Act ("APA"), Federal Land Policy and Management Act ("FLPMA"), National Environmental Policy Act ("NEPA"), Bald and Golden Eagle Protection Act ("BGEPA"), and violation of California Business and Professions Code § 17200 *et. seq.* On the same day, Plaintiffs filed a motion for preliminary injunction.  (Dkt. No. 27.)  On September 28, 2012, District Judge Hayes denied the motion for preliminary injunction.  (Dkt. No. 54.)

On October 4, 2012, Federal Defendants filed a copy of the administrative record.  (Dkt. No. 55.)  On the same day, the case was transferred to the undersigned judge.  (Dkt. No. 57.)

On November 20, 2012, Plaintiffs filed a motion for summary judgment.  (Dkt. No. 63.) Subsequently, Federal Defendants and Ocotillo Defendants filed a motion to strike the extra-record declaration of Scott Cashen.  (Dkt. Nos. 66, 68.)  Plaintiffs filed an opposition on December 13, 2012.  (Dkt. No. 71.)  Defendants filed a reply on December 18, 2012.  (Dkt. Nos. 72, 73.)  On December 21, 2012, the Court granted all Defendants' motion to strike the extra-record declaration of Scott Cashen and set a new briefing schedule for Plaintiffs to re-file their opening brief without reference to Cashen's declaration and accompanying exhibits.  (Dkt. No. 79.)

On December 28, 2012, Plaintiffs filed a revised brief in support of their motion for summary judgment.  (Dkt. No. 80.)  On January 1, 2013, Federal Defendants and Ocotillo Defendants filed an opposition and their cross-motions for summary judgment.  (Dkt. Nos. 83, 84.)  On January 18, 2013, Plaintiffs filed their reply and opposition to all Defendants' cross-motion for summary judgment. (Dkt. No. 88.)  On February 1, 2013, Federal Defendants and Ocotillo Defendants filed their reply to their cross-motions for summary judgment.  (Dkt. Nos. 96, 98.)

### Factual Background

On December 19, 1980, the Department of the Interior approved a Record of Decision ("ROD") for the California Desert Conservation Area ("CDCA") which established a "long-range, comprehensive plan for the management, use, development, and protection of over 12 million acres of public land . . . ."  (OWEF[1] 5914.)  On October 9, 2009, Ocotillo applied to the Bureau of Land

---

[1]OWEF refers to the Administrative Record filed with the Court.

Management ("BLM") and to the County of Imperial to construct and operate a wind energy facility on public land within the CDCA.  (OWEF 5261.)  In February 2012, Interior created a Proposed Plan Amendment & Final Environmental Impact Statement/Final Environmental Impact Report ("Final EIS" or "FEIS/FEIR") for the Ocotillo Wind Energy Facility ("Project") analyzing the impact of a 12,484 acre right-of-way over public land in favor of Ocotillo to build 155 wind turbine generators. (OWEF 804, 825.)  On May 11, 2012, Interior approved a Record of Decision for the Ocotillo Wind Energy Facility and Amendment to the California Desert Conservation Area Plan which approves a 10,151 acre right-of-way over public land in favor of Ocotillo to build 112 wind turbine generators. (OWEF 109.)

## Discussion

**A.    Standing**

Federal Defendants argue that LIUNA cannot assert representational standing and that the individual LIUNA members have not established standing.[2]  Plaintiffs disagree.

Article III, section 2 of the United States Constitution requires that a plaintiff have standing to bring a claim.  In order "to satisfy Article III' s standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).  The party seeking federal jurisdiction has the burden of establishing its existence.  Lujan, 504 U.S. at 561.

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Friends of the Earth, 528 U.S. at 181 (citing Hunt v. Washington State Apple Advertising Comm'n, 532 U.S. 333, 343 (1977)); see also Ecological Rights Fdn. v. Pacific Lumber Co., 230 F.3d 1141, 1147 (9th Cir. 2000).  An organization can assert the

---

[2]Federal Defendants do not object to standing as to Plaintiff Desert Protective Council.

standing of its members but must provide "specific allegations establishing that at least one identified members suffered or would suffer harm" and "generalized harm . . . will not alone support standing." Western Watersheds Project v. Kraayenbrink, 632 F.3d 472, 483 (9th Cir. 2011) (quoting Summers v. Earth Island Inst., 555 U.S. 448, 493 (2009)).

**1.    Injury in Fact**

Environmental plaintiffs sufficiently allege injury in fact when they contend that they "use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Friends of the Earth, Inc., 528 U.S. at 183.  A desire to observe an animal species, even for purely esthetic purposes, is a cognizable interest supporting standing. Lujan, 504 U.S. at 560.  A person can establish "injury in fact" by showing a "connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable-that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction-if the area in question remains or becomes environmentally degraded." Ecological Rights Fdn., 230 F.3d 1141, 1149-50 (9th Cir. 2000) (An individual who visits Yosemite National Park once a year to hike or rock climb and regards that visit as the highlight of his year is not precluded from litigating to protect the environmental quality of Yosemite Valley simply because he cannot visit more often).

Here, Plaintiffs present the declaration of John Norton, a member of LIUNA.  (Dkt. No. 88-1.) Norton states that he visits the site of the Project to do recreational target shooting.  (Id. ¶ 4.)  He first visited the site about eight years ago and visited more recently six months ago.  (Id. ¶ 4.)  He enjoys being out in the desert surrounded by wildlife and mountains and likes to put himself in the place of the original settlers as they crossed the desert.  (Id.)  While recreating at the site, he has enjoyed observing hawks, vultures and other birds flying around.  (Id. ¶ 9.)  He has recently recalled seeing a hawk and was concerned about the threats posed to hawks, burrowing owls and other birds from the spinning turbines.  (Id. ¶ 10.)  Norton has watched the transformation of the area since construction began and has strong feelings about losing the beautiful area of the desert and that a little piece of desert paradise around Ocotillo no longer exists.  (Id.)

The Court concludes that LIUNA has sufficiently established an injury of fact by one of its

members under the standing requirement.  See Western Watersheds Project, 632 F.3d at 483.

### 2.   Interests at Stake Are Germane to the Organization's Purpose

Federal Defendants assert that Plaintiffs have not shown that environmental interests are germane to LIUNA's organizational purpose.  Plaintiffs contend that LIUNA has established that LIUNA's interests include advocating for environmentally sustainable projects in furtherance of their members' recreational interests and quality of life.  (Dkt. No. 88-2, Smith Decl. ¶¶ 4-5.)

The Complaint alleges that LIUNA is a non-profit laborers and public service employees union with numerous members living in Imperial County.  (Dkt. No. 28, FAC ¶ 10.)  LIUNA represents construction workers and public service employees in many setting, including collective bargaining, seeking employment, training programs, legal rights, job safety and workplace fairness.  (Id. ¶ 14.) It advocates for programs and policies that promote good jobs and a healthy working environment for workers and their families.  (Id.)  Its advocacy involves participating in and where appropriate challenging Projects that would result in harmful environmental effects or the violation of environmental laws.  (Id.) John Smith, Business Manager/Secretary-Treasurer for LIUNA states that it works with local and national environmental organization to advocate for environmentally sustainable projects and jobs.  (Dkt. No. 88-2, Smith Decl. ¶¶ 2, 4.)  LIUNA has joined with the Sierra Club and the Natural Resources Defense Council to form the Blue-Green Alliance which supports the creation of "green jobs," which are jobs within the environmental field that can improve the environment and create good quality, living wage jobs.  (Id. ¶ 5.)  As expressed in speeches by its leaders, LIUNA's partnership with the Sierra Club and the Natural Resources Defense Council, will provide its members with training to obtain "green jobs" with federal prevailing wages and health care benefits and skills.  (Id., Exs. A, B.) LIUNA's purpose is to advocate for its members in obtaining jobs with a good quality, living wage environment in addition to promoting a better community through "green jobs."

In one case, the court explained that "even though Plaintiffs have alleged that environmental concerns are germane to CURE's purpose, they have not presented any evidence or argument that the interests at stake in this litigation are germane to the purposes of its member labor unions; and "purely economic interests . . . do not fall within NEPA's zone of interests."  Cal. Unions for Reliable Energy

1    v. U.S. Dept. of Interior, CV 10-9932-GW(SSx), 2011 WL 7505030, *7  (C.D Cal. 2011).

2          The interests at stake in the first amended complaint concern the impact of the Project on
3    numerous species of animals including avian and bat.  LIUNA's organizational interest does not
4    support these issues.  While its purpose is to promote a cleaner environment through the work of its
5    members, its purpose is not to protect the avian and bat species.  Accordingly, the Court concludes that
6    LIUNA has not shown that the environmental effects of the OWEF are germane to its purpose.
7    Consequently, LIUNA does not have standing to pursue these claims.

8          As to the individual members John Norton and Hector Casillas, only John Norton has provided
9    a declaration to support his standing in the matter.[3]  John Norton has established an injury in fact, that
10   the injury is traceable to the challenged action and the injury will be remedies by a favorable decision.
11   See Friends of the Earth, 528 U.S. at 180-81.  The Court concludes that John Norton has established
12   standing but Hector Casillas has not established standing.

13   **B.      Standard of Review**

14         The Administrative Procedures Act ("APA") governs judicial review of agency actions under
15   FLMPA, and NEPA.  See 5 U.S.C. § 706; see also Oregon Natural Res. Council Fund v. Brong, 492
16   F.3d 1120, 1124 (9th Cir. 2007) (FLPMA and NEPA).  An agency's decision must be upheld under
17   judicial review unless the court finds that the decision or action is "arbitrary, capricious, an abuse of
18   discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Actions that are approved
19   "without observance of procedure required by law" are also subject to be set aside upon judicial
20   review.  5 U.S.C. § 706(2)(D).

21         The standard is "highly deferential, presuming the agency action to be valid and affirming the
22   agency action if a reasonable basis exists for its decision."  Nw. Ecosystem Alliance v. U.S. Fish and
23   Wildlife Serv., 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  Agency action is valid if the
24   agency "considered the relevant factors and articulated a rational connection between the facts found
25   and the choices made."  Arrington v. Daniels, 516 F.3d 1106, 1112 (9th Cir. 2008) (citations omitted);
26   see also Nat'l Wildlife Fed v. U.S. Army, 384 F.3d 1163, 1170 (9th Cir. 2004) (an agency must present

27

28         [3]In opposition to a motion for summary judgment on standing, a plaintiff cannot rest on
     allegations in the complaint but must present specific facts, by affidavit or other evidence.  Lujan, 504
     U.S. at 561.

1   a "rational connection between the facts found and the conclusions made."). The burden is on Plaintiff

2   to show any decision or action was arbitrary and capricious. See Kleppe v. Sierra Club, 427 U.S. 390,

3   412 (1976).

4   **C.   Exhaustion**

5        Federal Defendants argue that Plaintiffs did not exhaust the claim that the ROW must contain

6   specific terms and conditions prohibiting any incidental take of raptors in light of section 3503.5 of

7   the California Department of Fish and Game Code ("CDFG") and the necessity of turbine curtailment.

8   Ocotillo also argues that Plaintiffs failed to exhaust the same claim alleged by Federal Defendants that

9   the BLM is legally obligated to prohibit the Project from incidentally killing any raptors or owls.

10  Moreover, Octotillo alleges two additional claims were not exhausted. First, Plaintiffs did not exhaust

11  the allegation that the BLM failed to make literature available to the public about data on other wind

12  projects and that the BLM's raptor count improperly compared data that excluded turkey vultures with

13  data from other sites that included turkey vultures.

14       The APA requires plaintiffs to exhaust their administrative remedies before bringing suit in

15  federal court. 5 U.S.C. § 704. "The purpose of the exhaustion doctrine is to allow the administrative

16  agency in question to exercise its expertise over the subject matter and to permit the agency an

17  opportunity to correct any mistakes that may have occurred during the proceeding, thus avoiding

18  unnecessary or premature judicial intervention into the administrative process." Buckingham v. Sec.

19  of the U.S. Dept. of Agriculture, 603 F.3d 1073, 1080-81 (9th Cir. 2010) (citation omitted). Although

20  "claimants who bring administrative appeals may try to resolve their difficulties by alerting the

21  decision maker to the problem in general terms, rather than using precise legal formulations" claimants

22  are still obligated to raise their problem "with sufficient clarity to allow the decision maker to

23  understand and rule on the issue raised." Id. (quoting Idaho Sporting Congress, Inc. v. Rittenhouse,

24  305 F.3d 957, 965 (9th Cir. 2002)).

25       An issue may be raised by any person during the administrative process and need not be raised

26  by the party filing the complaint. Portland Gen. Elec. Co. v. Bonneville Power Admin., 501 F.3d

27  1009, 1024 (9th Cir. 2007) (court will not invoke the waiver rule in reviewing a notice-and-comment

28  proceeding if an agency has had an opportunity to consider the issue even if the issue was raised by

[12cv1281-GPC(PCL)]

someone other than the petitioning party); see also Wyoming Lodgin & Rest. Ass'n v. U.S. Dept. of Interior, 398 F. Supp. 2d 1197, 1210 (D. Wyo. 2005); Comm. Advocates for Renewable Energy Stewardship v. U.S. Dept. of Interior, No. 12cv1499 WQH(MDD), 2012 WL 4471562, at*6 (S.D. Cal. September 23, 2012).

### 1.   ROW Claim

The claim that the ROW grant must contain specific terms and conditions prohibiting any incidental take of raptors in light of section 3503.5 of CDFG Code and turbine curtailment was brought up during the public comment period.  (OWEF 57371-72.)  On March 28, 2012, LIUNA wrote to the Imperial County Planning Development Services Department.  (OWEF 57365.)  The letter states that the "FEIR fails to impose all feasible mitigation measures and environmentally superior alternatives."  (OWEF 57370.)

> Many of these species are listed under state and/or federal endangered species laws. For example, the willow flycatcher is federally listed as endangered and state-listed as endangered (FE and SE, respectively). It is also present on the project site, as indicated above ("(present)"). Thus, the project proponent will have to obtain incidental take authorization for any take of this or any other species that is listed as endangered or threatened under state or federal endangered species laws.
>
> Furthermore, many species that will be impacted by the project are protected under other state and federal laws. For example, the golden eagle and the bighorn sheep are each "fully protected" species under California's Fish and Game Code (FGC) Sections 3511(a),(b)(7) and 4700 (a),(b)(2). Thus, the project must provide assurance that no take of these species will occur. The project does not do this - instead, it admits that individual golden eagles will in fact be taken under implementation of the project (See infra). This is unacceptable under California law.

(OWEF 57371-72.)  These statements states that certain species are specifically protected by the State no-take requirements while others are protected by requiring an incidental take authorization.  (Id.) Although not specific as to mentioning section 3505.5 of the CDFG Code, the issue of the incidental take of raptors was raised during the administrative public comment period.  See Buckingham, 603 F.3d at 1080-81.

The issue of turbine curtailing concerning raptors was also brought up by different groups. (OWEF 63723; 53891 (Center for Biological Diversity commented that raptors are highly vulnerable to collision with wind turbines and raised questions about the impacts to red-tailed hawks and the

mitigation measure); OWEF 54612 (Basin and Range Watch raised questions as to whether turbine curtailment would occur for red-tailed hawks, ospreys, prairie falcons, peregrine falcons, etc. found on Project site); OWEF 53759 (Audubon California stating that if the Avian Plan does not contain avoidance measures for migratory birds, it does not reduce the impacts of the Project to less than significant); OWEF 53747 (EPA Comments  - discussing whether there will be a curtailment of the turbines when other raptor species such as red-tailed hawks fly in the Project site).  These comments raised the issue before the agency of whether turbine curtailment would apply to raptors other than eagles.  They also questioned how the Project would minimize impacts to these other raptor species.

Moreover, BLM's response to these comments reveal that turbine curtailment was an issue raised during the administrative process.  See OWEF 3466-67 ("comment asks whether other species will be monitored with the radar and surveillance system and whether the turbines will be shut down for other raptor species besides golden eagles"); OWEF 3254 ("a discussion of whether there will be curtailment of the operating turbines when other raptor species such as red-tailed hawks fly in the OWEF site"); OWEF 3322 ("comment states that the Avian and Bat Protection Plan (ABPP) does not contain avoidance measures and does not reduce the impacts of the project on migratory birds to less than significant.").   The administrative record reveals that this issue was exhausted.

## 2.   Availability of Relevant Studies and Raptor Count Data

The issues as to whether BLM failed to make relevant studies available to the public was exhausted.  On April 23, 2012, Scott Cashen wrote,

> The ABPP that accompanies the FEIS/FEIR is significantly different than the version that accompanied the DEIS/DEIR.  The recently released version of the ABPP contains a substantial amount of new information that should have been disclosed to the public, decision makers, and biologists for review and comment prior to preparation of the FEIS/FEIR.

(OWEF 56782.)  In addition, on April 9, 2012, the Center for Biological Diversity objected to the FEIS/FEIR and stated it objected to "deferring development of detailed plans to protect resources until after public participation is completed, including, but not limited to the following: . . . Avian and Bat Protection Plan."  (OWEF 57175.)  These comments put the BLM on notice that relevant studies in the final ABPP were not made available to the public.  Therefore, the Court concludes that this issue was raised during the administrative process.

As to the allegation regarding the misapplied raptor count data, Plaintiffs claim they did not know about these claims until the final FEIS and final ABPP came out in February 2012.  It was not until the record was prepared in November 2012 that Plaintiffs could have determined that BLM did not include numerous newly referenced studies in the ABPP and the FEIS.  Therefore, they argue that they did not have to exhaust this issue.  Moreover they argue that any comments during the 30 day public notice period would have been futile as the BLM was not seeking further comment and the documents were no longer appealable through the protest process.  (OWEF 30967-970.)

Plaintiffs concede that they did not present this issue before the BLM.  Contrary to Plaintiffs' assertion, there was a 30 day protest period after the issuance of the FEIS/FEIS; only the ROW grant was not subject to protest.  (OWEF 30967-68.)  In fact, April 23, 2012, Plaintiffs, through their expert, Scott Cashen submitted 48 pages of comments on the FEIS which include comments on the final ABPP.  (OWEF 56746-794.)  However, Plaintiffs' protest was limited to issues raised during the planning process.  (OWEF 30970) ("A protest may only raise those issues which were submitted for the record during the planning process.")  Therefore, if Plaintiffs had raised the issue after the FEIS was publicly noticed, it would not have been able to present these issues to the BLM.

Accordingly, the Court concludes that this issue did not have to be exhausted.  See Southeast Alaska Conserv. Council, Inc. v. Watson, 697 F.2d 1305, 1309 (9th Cir. 1983) ("Exhaustion of administrative remedies is not required where administrative remedies are inadequate or not efficacious, where pursuit of administrative remedies would be a futile gesture, where irreparable injury will result unless immediate judicial review is permitted, or where the administrative proceeding would be void.")

**D.      Motion to Amend**

Federal Defendants argue that three of the four NEPA arguments concerning the integrity of the scientific data must be dismissed as they were not pled in the amended complaint and are raised for the first time in the motion for summary judgment.  Plaintiffs argue that their amended complaint adequately alleges their NEPA arguments as the three arguments challenge the relevant scientific information.  As a precautionary measure and in response to Federal Defendant's argument, on January 22, 2013, Plaintiffs filed a motion for leave to file a second amended complaint in the event the Court

finds that the claims are not adequately pled.

Moreover, Plaintiffs argue that they could not have been aware of the facts supporting their allegations challenging scientific evidence until it received the administrative record. They contend that it was not until they reviewed the administrative record that they questioned the scientific integrity of the FEIS/FEIR.

Under Federal Rule of Civil Procedure 15(a), leave to amend a complaint after a responsive pleading has filed may be allowed by leave of the court and such leave "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Granting leave to amend rests in the sound discretion of the trial court. International Ass'n of Machinists & Aerospace Workers v. Republic Airlines, 761 F.2d 1386, 1390 (9th Cir. 1985). This discretion must be guided by the strong federal policy favoring the disposition of cases on the merits and permitting amendments with "extreme liberality." DCD Programs Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987). In assessing the propriety of amendment, the court should consider the following factors: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party and the futility of amendment. See United States ex rel. Schumer v. Hughes Aircraft Co., 63 F.3d 1512, 1527 (9th Cir. 1995); Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 339 (9th Cir. 1996). In practice, however, courts more freely grant plaintiffs leave to amend pleadings in order to add claims than new parties. Union Pacific R.R. Co. v. Nevada Power Co., 950 F.2d 1429, 1432 (9th Cir. 1991).

Because Rule 15(a) favors a liberal policy, the nonmoving party bears the burden of demonstrating why leave to amend should not be granted. Genetech, Inc. v. Abbott Laboratories, 127 F.R.D. 529 (N.D. Cal. 1989). Plaintiffs must show "good cause" however, in order to amend a pleading once a pretrial scheduling order has issued pursuant to Fed. R. Civ. P. 16(b). Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992). The four factors used to determine the propriety of a motion for leave to amend are: bad faith, undue delay, prejudice to the opposing party, and futility of amendment. Roth v. Garcia Marquez, 942 F.2d 617, 628 (9th Cir. 1991). These factors are not equally weighted; the possibility of delay alone, for instance, cannot justify denial of leave to amend. DCD Programs, 833 F.2d at 186; Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990) ("[D]elay of nearly two years while not alone enough to support

1    denial, is nevertheless relevant.")  The single most important factor is whether prejudice would result

2    to the nonmovant as a consequence of the amendment.  William Inglis & Sons Baking Co. v. ITT

3    Continental Baking Co., 668 F.2d 1014, 1053 (9th Cir. 1981).

4         In the Ninth Circuit, if a complaint does not include the necessary factual allegations to state

5    a claim, it is not sufficient to allege such claims in a motion for summary judgment.  Navajo Nation

6    v. U.S. Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008); see also Wasco Prods., Inc. v. Southwall

7    Techs., Inc., 435 F.3d 989, 992 (9th Cir. 2006) ("'Simply put, summary judgment is not a procedural

8    second chance to flesh out inadequate pleadings.'"); Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d

9    963, 968–69 (9th Cir. 2006) (holding that the complaint did not satisfy the notice pleading

10   requirements of Federal Rule of Civil Procedure 8(a) because the complaint "gave the [defendants]

11   no notice of the specific factual allegations presented for the first time in [the plaintiff's] opposition

12   to summary judgment").

13        The first amended complaint alleges a general allegation that "BLM ignored relevant scientific

14   information, failed to assess the baseline from which to measure impacts . . . ." (Dkt. No. 28, FAC ¶

15   4.) In articulating and citing the standard for scientific analysis, the first amended complaint contends

16   that "[a]gencies must insure the professional integrity, including scientific integrity, of the discussion

17   and analysis in an EIS.  40 C.F.R. § 1502.24.  The information in an EIS must be of high quality, as

18   accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing

19   NEPA.  40 C.F.R. §§ 1500.1(b), 1502.24."  (Id. ¶ 29.)  Although Plaintiffs challenge the scientific

20   integrity of the EIS, they did not provide any supporting facts sufficient to put Defendants on notice

21   as to the nature of the claims.  See Fed. R. Civ. P. 8.

22        Plaintiffs argue they could not have known about these claims until they received the

23   administrative record.  The administrative record was filed with the Court on October 4, 2012. (Dkt.

24   No. 55.)  Plaintiffs have not shown why they did not seek leave to amend the complaint prior to

25   January 22, 2013 after their motion and reply for summary judgment and Defendants' opposition and

26   cross-motions for summary judgment had been filed.  There was undue delay.  The Court concludes

27   that Plaintiffs have not shown good cause why leave of court should be granted to file an amended

28   complaint.  However, the Court addresses the merits of all of Plaintiffs' NEPA claims as the

Defendants have fully addressed all NEPA claims.

**E.      National Environmental Protection Act ("NEPA")**

Plaintiffs present four arguments that the Federal Defendants violated NEPA.  First, Plaintiffs argue that BLM violated NEPA by failing to make available or independently evaluate critical raptor studies pertaining to raptor use at other wind energy projects.  Second, Plaintiffs contend that the BLM failed to maintain the scientific integrity of the NEPA process by misapplying raptor use numbers. Third, Plaintiffs assert that EIS's baseline for Swainson's hawks lacks scientific integrity because surveys relied upon included months where Swainson's hawks would not be migrating through the project site.  Fourth, Plaintiffs argue that the FEIS/FEIR contains no information concerning why turbine curtailment is not effective to avoid raptor collision mortality for raptors other than golden eagles.

NEPA requires agencies considering "major Federal actions significantly affecting the quality of the human environment" to prepare and issue an environmental impact statement ("EIS").  Brong, 492 F.3d at 1132 (citing 42 U.S.C. § 4332(C)).  The statement must "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1. The Court's role is to ensure that the agency took a "hard look" at the potential environmental consequences of the proposed project.  Brong, 492 F.3d at 1132 (citation omitted).  "We review an EIS under a rule of reason to determine whether it contains a 'reasonably thorough discussion of probable environmental consequences.'"  Selkirk Conserv. Alliance v. Forsgren, 336 F.3d 944, 958 (9th Cir. 2003).  The court does not substitute its judgment for that of the agency.  Id.  NEPA does not contain substantive environmental standards, nor does the Act mandate that agencies achieve particular substantive environmental results.  Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003).

**1.      Availability of Raptor Studies to the Public and Independently Evaluating the Studies**

Plaintiffs argue that the BLM violated NEPA by failing to make available or independently evaluate critical raptor studies pertaining to raptor use at other wind energy projects.  Specifically,

Plaintiffs allege that the draft Avian Plan referenced a report, Fall 2009/Spring 2010 Raptor Migration Report prepared by Ocotillo West's consultant Helix, that was not an open-source document. In addition, the final ABPP references raptor studies at other wind turbine projects that was not open to a formal comment period and not available to the public. Moreover, without access to the underlying data referenced in the ABPP, Plaintiffs argue that BLM could not have independently reviewed the data to support its analysis and conclusion. Therefore, the NEPA process was severely undermined when these report and studies were not made available and accessible to the public.

Federal Defendants argue that the BLM fully complied with the public comment procedure under NEPA. They argue that NEPA does not require it to provide reference materials from secondary, non-NEPA documents. They also contend that Plaintiffs participated during the comment period. Ocotillo Defendants contend that BLM made information about raptors available to the public. The parties dispute whether the final ABPP, attached as an Appendix L6 to the FEIS, is considered an FEIS document or a document incorporated by reference in the FEIS.

The implementing regulations provides:

> Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is *reasonably available* for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

40 C.F.R. § 1502.21 (emphasis added).

In addition,

> Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

40 C.F.R. § 1502.24.

An EIS will be found to be in compliance with NEPA "when its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed projects'

environmental impact and encourage public participation in the development of that information." Coalition for Canyon Preserv. v. Bowers, 632 F.2d 774, 782 (9th Cir. 1980) (citing Trout Unlimited v. Morton, 509 F.2d 1276, 1282-83 (9th Cir. 1974)).  Supporting studies in the EIS need not be physically attached to the EIS and only be "available and accessible."  Bowers, at 782.

NEPA requires that "the public receive the underlying environmental data  from which a [an agency] expert derived her opinion."  Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1150 (9th Cir. 1988).  Failure to provide this information "either vitiates a plaintiff's ability to challenge an agency action or results in the courts second guessing an agency's scientific conclusions."  Id.  However, an agency is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard look at the issues and responds to reasonable opposing viewpoints. See 40 C.F.R. § 1502.9(a)-(b).  Since analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies.  Marsh v. Ore. Natural Res. Council, 490 U.S. 360, 377 (1989). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive."  Id. at 378.  At the same time, courts must independently review the record in order to satisfy themselves that the agency has made a reasoned decision based on its evaluation of the evidence.  Id.  (citing Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1301 (9th Cir. 2003)).

According to the regulations,

> If agency prepares an appendix to an environmental impact statement the appendix shall:
>
> (a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).
> (b) Normally consist of material which substantiates any analysis fundamental to the impact statement.
> (c) Normally be analytic and relevant to the decision to be made.
> (d) Be circulated with the environmental impact statement or be readily available on request.

40 C.F.R. § 1502.18.  Moreover, in explaining the difference between an appendix and an incorporation by reference, the Council on Environmental Quality ("CEQ") answered the following:

25b. Q. How does an appendix differ from incorporation by reference?

A. First, if at all possible, the appendix accompanies the EIS, whereas the material

which is incorporated by reference does not accompany the EIS. Thus the appendix should contain information that reviewers will be likely to want to examine. The appendix should include material that pertains to preparation of a particular EIS. Research papers directly relevant to the proposal, lists of affected species, discussion of the methodology of models used in the analysis of impacts, extremely detailed responses to comments, or other information, would be placed in the appendix. . . .

Material that is not directly related to preparation of the EIS should be incorporated by reference. This would include other EISs, research papers in the general literature, technical background papers or other material that someone with technical training could use to evaluate the analysis of the proposal. *These must be made available, either by citing the literature, furnishing copies to central locations, or sending copies directly to commentors upon request.*

Care must be taken in all cases to ensure that material incorporated by reference, and the occasional appendix that does not accompany the EIS, are in fact available for the full minimum public comment period.

CEQ, Forty Most Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed. Reg. 18,026, 18,034 (Mar. 23, 1981) (emphasis added).

In February 2012, BLM issued the FEIS/FEIR. The final Avian Plan is attached as an appendix to the FEIS/FEIR. (OWEF 2923.) The final ABPP contains a citation to 34 raptor use studies at other wind turbine projects that were not included in the draft ABPP. (OWEF 2959.) These studies are cited and incorporated by reference in the final ABPP.[4] According to CEQ, citation to the studies is sufficient for a study to be made reasonably available to the public. 46 Fed. Reg. at 18,034.

Although there was no public comment period as there was with the DEIS, there was a 30 day publication of notice requirement and a public protest period for the Plan Amendment. 40 C.F.R. § 1506.10(a)(2); (OWEF 30966-69); (OWEF 30969) (text of 43 C.F.R. § 1610.5-2.) Desert Protective Council submitted comments on the FEIS during this period and it also submitted 48 pages of comments on the FEIS and final ABPP through its expert, Scott Cashen. (OWEF 118-19; 56746-94.) As Federal Defendants argue, these comments on the FEIS and final ABPP did not object or comment on the unavailability of these 34 studies.

Accordingly, the Court concludes that the 34 raptor studies were made reasonably available

---

[4]The Court disagrees with the Federal Defendants contention that the ABPP is incorporated by reference in the FEIS. According to CEQ, an appendix and incorporation by reference are different. A document incorporated by reference is not attached to the FEIS while an appendix is attached to the FEIS. See Fed. Reg. 18,034 (Mar. 23, 1981).

[12cv1281-GPC(PCL)]

to the public.  Similarly, the Fall 2009/Spring 2010 Raptor Migration Report prepared by Ocotillo West's consultant Helix was cited in the draft ABPP and the final ABPP.  Therefore, citation to a report is sufficient to make the report reasonably available to the public.  See 46 Fed. Reg. at 18,034.

Plaintiffs also summarily argue that because the BLM did not make available the underlying data to come to its conclusion that the Project site is a low use raptor site compared to other wind turbine areas, it did not independently analyze the data.  This implication is not supported by any evidence.  Federal Defendants contend that the record shows that U.S. Fish and Wildlife Service, the agency with jurisdiction over the resources and statutes the ABPP is designed to address, conducted a detailed review of the ABPP prior to the final EIS.  (OWEF 799.)  Moreover, they argue that this argument is pure speculation without any supporting evidence.   The Court agrees.

Accordingly, the Court concludes that BLM did not arbitrarily or capriciously fail to comply with NEPA's public comment procedure.

### 2.    Scientific Integrity of Raptor Use Numbers

Plaintiffs contend that the BLM failed to maintain the scientific integrity of the NEPA process by misapplying raptor use numbers drawn from critical raptor studies.  They argue that Defendants misapplied the data from the studies concluding that raptor use at the Project site was low compared to other wind turbine projects by excluding the number of turkey vultures from the raptor count data while the data from the other sites included turkey vultures.

All Defendants acknowledge that the turkey vulture numbers were removed for purposes of comparing OWEF to other wind turbine projects.[5]  However, Federal Defendants argue that Plaintiffs' claim of misapplication of raptor use numbers is unsupported by the record and fails to take into account all of the substantial evidence in the record in support of the BLM's decision which include three different approaches used to measure raptor impacts.  Ocotillo further argues that Plaintiffs are impermissibly "fly-specking" an agency's scientific judgment contending that Plaintiffs' claim amounts to an alternative methodology for calculating and comparing turkey vultures' role in raptor

---

[5]Federal Defendant and Ocotillo Defendants, in footnotes in their oppositions contend that turkey vultures were excluded from the data reports in the ABPP for other projects and that the Erickson study shows that turkey vultures were removed if one looks at the average raptor use reported for Altamont Pass.  (Dkt. No. 84-1 at 19 n. 7; Dkt. No. 83 at 24 n. 14.)

use at the Project site with other sites.

A court reviewing an agency action "involv[ing] primarily issues of fact," and where "analysis of the relevant documents requires a high level of technical expertise," must "defer to the informed discretion of the responsible federal agencies." Sierra Club v. U.S. E.P.A., 346 F.3d 955, 961 (9th Cir. 2003) (citing Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 377 (1989)).  "A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA."  Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1051 (9th Cir. 2012) (citing Northern Plains Resource Council v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011).  "Courts may not impose themselves 'as a panel of scientists that instructs the [agency] . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty.'"  Id. (citation omitted).  And "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  Id.; Arizona Cattle Growers' Ass'n, 273 F.3d 1229, 1236 (9th Cir. 2001) ("We are deferential to the agency's expertise in situations, like that here, where resolution of the dispute involves primarily issues of fact.").  While the court's deference to the agency is significant, the court may not defer to an agency decision without a substantial basis in fact.  Fed. Power Comm'n v. Florida Power & Light Co., 404 U.S. 453, 463 (1972).

As part of the review process, the BLM drew an assessment of risk to birds and bats which was based on three approaches: (1) a comparison of annual use relative to other facilities in the United States; (2) an estimate of fatality rates based on other publicly available studies for which both raptor use and raptor fatality rates were available; and (3) an estimate of risk based on fatality rates estimated for other California wind energy facilities.  (OWEF 2959.)  The data for the comparison of annual raptor use is set out on in Figure 3 of the ABPP, a chart that compares 44 projects including the Altamont Pass facility. (OWEF 2959.)  The mean raptor estimate for the Altamont Pass facility is premised on the Erickson, W., et al. 2002 study[6] entitled, "Synthesis and Comparison of Baseline

---

[6]Although the study was not included in the administrative record, BLM agreed to supplement the record with the Erickson Study.  (Dkt. No. 79 at 5.)

Avian and Bat Use, Raptor Nesting and Mortality Information from Proposed and Existing Wind Development." (OWEF 2959.) The ABPP concluded that the Project site ranked 41 out of 44 projects with respect to raptor use.

Table 7 of the Erickson, et al. 2002b study summarizes data from 17 of the 44 wind energy sites referenced in the final ABPP.  Table 7 is entitled "Mean raptor/vulture use estimates (estimated #/20-min survey) by study areas."  (Dkt. No. 63-6 at 94.)  The final ABPP provides a graph (Figure 3) comparing raptor counts at the Project site to raptor use at other wind turbine projects.  (OWEF 2959.)  The ABPP explicitly states that the comparisons were made omitting turkey vultures from the raptor count data from the Project site.  (OWEF 2958.)

On its face, it would appear that the comparisons were not proper as the raptor count for the ABPP excluded turkey vultures while the Erickson study included turkey vultures.  However, as Federal Defendants point out, there are unexplained discrepancies in the numbers in Figure 3 of the ABPP and Table 7 of the Erickson study.  For example, Federal Defendants argue that by looking at the numbers for Altamont Pass, it can be inferred that turkey vultures were removed from the Altamont Pass data.  In the 2002 study, the mean raptor estimate for Altamont Pass ranges from 2.063 to 3.375 while in the ABPP, the mean raptor estimate for Altamont pass slightly exceeds 1.5.  (Dkt. No. 83 at 24 n. 14.)  The lower mean raptor estimate in the ABPP would indicate that turkey vultures were removed from the Altamont data for purposes of comparing it to the Project.[7]  Federal Defendants' conclusions are only an inference and not supported by expert analysis; however, that discrepancy is not explained by Plaintiffs and raises issues as to whether the Court should defer scientific judgments and technical analyses to the agency.  As this issue was not properly in the amended complaint and could not be exhausted, BLM did not have the opportunity to address this issue in the administrative record.  The Court is not in a position to make scientific and technical analyses related to this issue.

Moreover, Federal Defendants argue that Table 3 of the ABPP only uses eight studies from the

---

[7]In their reply, Plaintiffs' counsel conducts detailed calculations to show that Defendants' analysis is incorrect and that turkey vultures were removed only for this Project while all other comparative studies included turkey vultures.  (Dkt. No. 88 at 28-32.)  However, Plaintiffs do not provide an explanation as to why the raptor use numbers at Altamont Pass are different in the ABPP and Table 7.

[12cv1281-GPC(PCL)]

Erickson report, (OWEF 2959), while the ABPP study encompassed comparison with 44 other wind facilities.  (OWEF 2958.)  Therefore, it cannot be assumed that the other 36 studies had the same alleged flaw as the Erickson report.

Lastly, the ABPP's conclusion that the raptor use at the OWEF was low was based on three different approaches and despite the alleged discrepancy noted by Plaintiffs, they have not demonstrated that the BLM's conclusion, that the number of raptors in the Project area would be relatively low based on the other factors, was not scientifically sound.  (OWEF 2958.)

The Court concludes that Plaintiffs have not demonstrated that the BLM violated NEPA by misapplying the data from the studies.

### 3.    Baseline for Swainson's Hawk

Plaintiffs assert that the EIS's baseline for Swainson's hawks lacks scientific integrity because surveys relied upon included months where Swainson's hawks would not be migrating through the project site.  Therefore, the number of hawks observed by biologists were lower than they should have been and therefore, the BLM concluded that Swainson's hawks were infrequent users in the Project site.  In sum, Plaintiffs argue that the spring migration surveys should have started a month earlier and fall migration surveys continued too long.  They also dispute the calculation of Swainson's hawk's use rate of the Project area by averaging hawk observations throughout the entire survey period masking the higher use levels during peak periods.

Federal Defendants argue that Plaintiffs oppose the methodology used to assess raptor use at the project site.  BLM conducted three raptor migration reports when it was required to prepare only one and conducted numerous other studies, reports and surveys on birds, including the Swainson's hawk.  Ocotillo contends that BLM's raptor surveys provide an appropriate method of determining the baseline for Swainson's hawks and that BLM's decision to conduct migration surveys from March through May was reasonable.  All Defendants argue that Plaintiffs seek to fly-speck BLM's scientific judgment and second guess the methodology by which the EIS determined the baseline for Swainson's hawks.

According to the regulations, accurate and complete information regarding the environmental baseline of a project is key to evaluating a project's impact.  40 C.F.R. § 1500.1(b); 40 C.F.R. §

1502.24 (agencies must ensure scientific integrity of the discussions and analysis in EIS). However, it is not the role of this court "to decide whether an [EIS] is based on the best scientific methodology available." Alaska Survival v. Surface Transp. Bd., --- F.3d ----, 2013 WL 264653 (9th Cir. Jan. 23, 2013) (citing McNair, 537 F.3d at 1003 (internal quotations omitted) (alterations in original). As long as the agency engages in a "reasonably thorough discussion," courts do not require unanimity of opinion among agencies. City of Carmel–By–The–Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1151 (9th Cir. 1997) (internal quotations omitted). "A disagreement among experts or in the methodologies employed is generally not sufficient to invalidate an EA . . . . Courts are not in a position to decide the propriety of competing methodologies . . . .but instead, should determine simply whether the challenged method had a rational basis and took into consideration the relevant factors." Comm. to Preserve Boomer Lake Park v. Dept. of Transp., 4 F.3d 1543,1553 (10th Cir. 1993).

Disagreeing with the methodology conducted by the agency does not constitute a NEPA violation. Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1053 (9th Cir. 2012) (court may not assert its opinions in place of forest biologists). Court is required to be "at its most deferential" when reviewing scientific judgements and technical analyses within the agency's expertise. Northern Plains Res. Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, 1075 (9th Cir. 2011) (court is not to "act as a panel of scientists that instructs [the agency] . . . , chooses among scientific studies . . ., and orders the agency to explain every possible scientific uncertainty . . . [w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). "[A]gency must, at a minimum, support its conclusion with studies that the agency deems reliable." Id.

The BLM concluded that Swainson's hawks are an infrequent user of the Project site based on different factors and not just the raptor migration survey. (OWEF 1596) ("Collision risk for Swainson's hawk is considered low due to the species' low use of the proposed OWEF site during the fall and spring (0.026 observation/hour) made over the four seasons of rator counts . . . ."); (OWEF 21797) (topography is not conducive to funneling migratory birds through Project site and so raptor use will be low); (OWEF 334-50) (documenting that two years of raptor migration counts found only a total of 71 Swainson's Hawk during the 2 year of count); OWEF 2302 (finding that OWEF site does

1  not appear to be a part of the Swainson's Hawk's fall or spring migration route); OWEF 1141 (finding

2  that because of the low numbers migratory species, the Project site is not a major migratory corridor

3  with the exception of four species, which does not include Swainson's Hawk).

4         The record shows that the methodology used for the migration survey was conducted in

5  accordance with the California Department of Fish & Game and the California Energy Commission.

6  (OWEF 1138.) While the CEC and CDFG guidelines do not prescribe when a raptor migration survey

7  must occur, it gives the Applicant discretion in formulating the survey design taking into consideration

8  the type of project and the potentially impacted species.  (OWEF 50764.)

9         Lastly, Federal Defendants contend that the Raptor Migration Surveys encompassed a large

10  number of raptors including Cooper's hawk, ferruginous hawk, merlin, and northern harrier.  (OWEF

11  49907.)  The Applicant was only required to prepare one raptor migration survey.[8]  (OWEF 1138.)

12  All of the species have different patterns of migration with different peak periods for the Fall and

13  Spring raptor surveys.  (OWEF 49908-09.)  In selecting a survey period, the applicant had to pick a

14  period that reasonably captures the migratory period for a variety of bird species.

15         Plaintiffs have not shown that the BLM's selection of certain months to conduct raptor

16  migration surveys was arbitrary and capricious.

17         **4.      Turbine Curtailment Re: Other Raptors**

18         Plaintiffs maintain that the BLM did not take a hard look at turbine curtailment as a mitigation

19  measure for all protected raptors and owls and not just golden eagles.[9]  They argue that the ABPP does

20  not discuss how the mitigation measure will prevent the killing of raptors and burrowing owls.

21         Federal Defendants argue that the mitigation plan for the golden eagle was developed to

22  comply with the BGEPA and for a different purpose than the ABPP.  Ocotillo recognized the

23  heightened sensitivities to the golden eagle and was willing to provide a higher standard on mitigation

24  for this species.  (OWEF 23569-71.)  Ocotillo argues that the BLM went beyond NEPA's procedural

26         [8]In this case, it prepared four migration surveys.  (OWEF 1138.)

27         [9]Real time turbine curtailment involves enabling an on-site biologist to detect and identify bird
28  using a radar monitor within the Project area and to shut down one or more turbines within 60 seconds.
(OWEF 1595, 3197.)  This monitoring would occur during the first 10 years of operation.  (OWEF
1595.)

[12cv1281-GPC(PCL)]

1    requirements for mitigation and conducted an extremely thorough evaluation of the Project's potential

2    impacts on raptor species.

3         NEPA's implementing regulations requires agencies to discuss potential mitigation measures

4    in their EIS.  40 C.F.R. §§ 1502.14(f); 1505.2(c); 1508.25(b)(3).  Mitigation must "be discussed in

5    sufficient detail to ensure that environmental consequences have been fairly evaluated."  Pac. Coast

6    Fed. of Fishermen's Ass. v. Blank, 693 F.3d 1084, 1103 (9th Cir. 2012) (citing Robertonson v.

7    Methow Valley Citizens Council, 490 U.S. 332, 353 (1989)).  "NEPA does not require a fully

8    developed plan that will mitigate all environmental harm before an agency can act; NEPA requires

9    only that mitigation be discussed in sufficient detail to ensure that environmental consequences have

10   been fully evaluated." Laguna Greenbelt, Inc. v. U.S Dept. of Transp., 42 F.3d 517, 528 (9th Cir.

11   1994).  Such discussion necessarily includes "an assessment of whether the proposed mitigation

12   measures can be effective."  S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior,

13   588 F.3d 718, 727 (9th Cir. 2009).  NEPA is a purely procedural statute and does not require an agency

14   to a adopt a particular mitigation measure.  Pac. Coast Fed. of Fishermen's Ass., 693 F.3d at 1104 n.

15   16.  As long as the mitigation measure is discussed in sufficient detail, then the NEPA regulations are

16   met.  See Laguna Greenbelt, Inc., 42 F.3d at 528.

17        Here, the FEIS states that the ABPP "will describe proposed OWEF design features and

18   advanced conservation practices to be used to minimize the risk of collision pre-construction, during

19   construction, and during O&M.  The plan will include monitoring, adaptive management, and

20   reporting procedures." (OWEF 1626.)  It will also include post-construction monitoring.  (OWEF

21   1626-27.)  After a thorough evaluation of the impacts on raptor species, BLM prepared the ABPP, a

22   mitigation plan applicable to all avian and bat species.  (OWEF 2922-3008.)  The ABPP provides

23   detailed information about mitigation as to avian and bat species during each phase of the Project

24   including pre-construction, construction and operation phase of the project.  (OWEF 2970-72.)

25   Furthermore, the ABPP discusses how post-construction monitoring and adaptive management will

26   avoid, minimize and mitigate impacts to avian and bats.  (OWEF 2972-75.)  The process involves a

27   Technical Advisory Committee ("TAC") which will monitor OWEF activities, including mortality

28   date, to determine the need for project mitigation.  (OWEF 2972.)

Separately, BLM prepared a special Eagle Conservation Plan ("ECP") recognizing that golden eagles are subject to special protection under the BGEPA.  (OWEF 3157-3232.)  This plan includes Advanced Conservation Practices ("ACP") designed to curtail turbines if and when golden eagles approach.  (OWEF 1708; 3202-05.)   "This monitoring program is unlike anything implemented to date at a wind energy facility anywhere in the world and will not only provide a test of state of the art technological solutions and their ability to eliminate golden eagle collisions, but will also provide a unique opportunity to gain a better understanding of the interaction of golden eagles and wind energy facilities." (OWEF 3194.) Turbine curtailment will involve an on-site biologist using a radar to detect and identify golden eagles flying within a mile of the Project area.  (OWEF 3197.)  Curtailment of the turbines can happen within 60 seconds when a golden eagle flies into the Project area.  (OWEF 3197.) The ECP requires curtailment as part of the Project.  (OWFE 3202.)

Plaintiffs argue that short of turbine curtailment, there will be permanent unavoidable impact to other avian species.  However, NEPA does not require a substantive result, but only requires that mitigation is discussed in sufficient detail.  See Pac. Coast Fed. of Fishermen's Ass, 693 F.3d at 1103.

The record provides sufficient detail as to the mitigation measures for other protected raptors and owls.  See Laguna Greenbelt, Inc., 42 F.3d at 528.  Accordingly, the Court concludes that the BLM did not act arbitrarily or capriciously in not including all protected raptors and owl in the turbine curtailment mitigation measure.

**F.      Federal Land Policy Management Act ("FLPMA")**

Under the FLPMA, Plaintiffs present three arguments.  First, they contend that the BLM violated 42 U.S.C. § 1765(a)(iv) which requires the Project to comply with the more stringent state standards for environmental protection.  Second, they argue that the Secretary violated his duty under 43 U.S.C. § 1765(a)(ii) to include ROW conditions minimizing damage to wildlife habitat and protecting the environment.  Third, Plaintiffs contend that the BLM violated FLPMA by approving an ROW that is inconsistent with the CDCA Plan's Class L land use designation and its duty to avoid and mitigate environmental impacts to sensitive species.

**1.      Failure to Comply with California State Standards under 43 U.S.C. § 1765(a)(iv)**

Plaintiffs contend that BLM violated its duty under 43 U.S.C. § 1765(a)(iv) which requires the

ROW to include specific conditions to comply with all applicable substantive state environmental laws.  Specifically, they argue that the ROW did not include conditions that will comply with California Fish & Game Code sections 3503.5, 3511 and 2080 which prohibit the killing of *any* raptors or owls.

Federal Defendants contend that FLPMA does not require that the BLM interpret and enforce state standards; it only requires compliance with State standards and that it is the responsibility of the State to enforce compliance with its laws.  Second, Federal Defendants argue that the CDFG which is charged with interpreting and administering the Fish and Gaming Code did not object to the Project and the proposed mitigation measures.

Ocotillo Defendants maintain that they met the requirements under section 505(a)(iv) of FLPMA as the ROW requires compliance with California's standards for environmental protection. (OWEF 470.)  Moreover, Plaintiffs' argument that the ROW has to provide specific conditions requiring BLM to independently determine or incorporate state standards is not legally supported. Lastly, they assert that the case law does not require the ROW grantor, BLM, to determine state substantive standards and incorporate them into an ROW but requires the grantee to determine its compliance with state standards to state authorities.

FLPMA provides that each right of way granted by BLM shall contain terms and conditions which will "require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance of or for rights-of-way for similar purposes if those standards are more stringent than applicable Federal standards." 43 U.S.C. § 1765(a). California Fish & Game Code section 3503.5 states that "[i]t is unlawful to take, possess, or destroy any birds in the orders Falconiformes or Strigiformes (birds-of-prey) or to take, possess, or destroy the nest or eggs of any such bird except as otherwise provided by this code or any regulation adopted pursuant thereto." Cal. Fish & Game Code § 3503.5.  California Fish & Game Code section 2080, also known as the California Endangered Species Act ("CESA"), similarly states that "[n]o person shall import into this state, export out of this state, or take, possess, purchase, or sell within this state, any species, or any part or product thereof, that the commission determines to be an endangered species or a threatened species, or attempt any of those acts, except as otherwise provided in this chapter . .

[12cv1281-GPC(PCL)]

. .." Cal. Fish & Game Code § 2080.  Moreover, California Fish & Game Code section 3511 states that the golden eagles are fully protected birds subject to the strict provisions that prohibit the taking of such species with very limited exceptions.  Cal. Fish & Game Code § 3511(a)(1).

The ROW expressly provides that the Project must comply with all laws, including state law. (OWEF 458) ("compliance with all applicable laws and regulations); (OWEF 860) (list of required federal, state and local permits and approvals).  It also lists CDFG as a cooperating agency.  (OWEF 860; 1641.)  While Plaintiffs assert that the ROW, itself, requires specific state standards, i.e. specific citation to the Code, to prevent the killing of raptors and owl, they have not provided legal authority that there is such a requirement.

The CDFG has the authority to regulate potential impacts to species that are protected under CESA. (OWEF 1641.)  Section 1802 provides that the California Department of Fish and Game has

> jurisdiction over the conservation, protection, and management of fish, wildlife, native plants, and habitat necessary for biologically sustainable populations of those species. The department, as *trustee* for fish and wildlife resources, shall consult with lead and responsible agencies and shall provide, as available, the requisite biological expertise to review and comment upon environmental documents and impacts arising from project activities.

Cal. Fish & Game Code § 1802 (emphasis added).  "The trustee charged with the responsibility to implement and preserve the trust alone has the right to bring such an action."  Ctr. for Biological Diversity, Inc. v. FPL Group, Inc., 166 Cal. App. 4th 1349, 1367 (2008).

Both parties cite to Montana v. Johnson, 738 F.2d 1074 (9th Cir. 1984) and Columbia Basin Land Protection Ass'n v. Schlesinger, 643 F.2d 585 (9th Cir. 1981) in support of their positions. Plaintiffs argue that these cases supports their assertion that the ROW should contain specific conditions in a ROW grant to require compliance with more stringent state standards and that the right of way grant had to include project specific conditions.   Federal Defendants contend that these cases support their position that state law requirements are to be enforced by state agencies and not the BLM.

Montana held that section FLPMA's section 505(a)(iv) allows states to impose more stringent measures of environmental protection on ROW grantees than the federal government requires. Montana, 738 F.2d at 1079.  The "central purpose of more stringent environmental protection at the option of the state is furthered by according states the discretion to impose route-specific requirements on federal grantees."  Id.

In Columbia Basin, the court held that the Bonneville Power Adminiatration, the ROW grantee, had to comply with Washington's substantive standards for environmental protection. Columbia Basin Land Protection Ass'n, 643 F.2d at 604. In reviewing the legislative history of FLPMA, there is clear congressional intent to require "federal agencies to meet the state's substantive standards for projects under FLPMA." Id. at 605.

In both cases, it was the State of Montana and Intervenor, the State of Washington that filed and joined suit and alleged failure of the ROW to comply with state substantive law. See Envtl. Prot. Info. Ctr. v. U.S. Fish & Wildlife Serv., No. C04-4647-CRB, 2005 WL 3877605, at *4 (N.D. Cal. 2005) (rejecting argument that the USFWS take permit was illegal because it violated California 's Fish & Game Code section 3503.5 as the State may enforce its laws).

The CDFG is the state agency responsible for interpreting and enforcing provision under the California Fish & Game Code. The record shows that the CDFG did not object to the mitigation plans but cooperated with the BLM. See OWEF 56263-276 (comment letter to DEIS/EIR). In 2007, the CDFG and the California Energy Commission developed Guidelines for Reducing Impacts to Birds and Bats from Wind Energy Development. (OWEF 50710-846.) The guidelines contemplate the taking of birds and bats. (OWEF 50755) ("The CDFG is aware that wind energy projects may result in bird and bat fatalities despite avoidance and minimization measures.). "In addition to CDFG's responsible and trustee role in the CEQA process, direct consultation with CDFG is required to ensure that a proposed project will meet the intent of Fish and Game Code statutes for the protection of wildlife species." (OWEF 50756.) The guidelines also discuss how to avoid and minimize impacts to birds. (OWEF 50785-793.) It also provides for adaptive management. (OWEF 50792.)

Plaintiffs' assertion that California Fish & Game Code prohibits the killing of any raptors is not factually or legally supported. See Center for Biological Diversity, Inc. v. FLP Group, Inc., 166 Cal. App. 4th 1349, 1372 (2008) ("public agencies . . . are attempting to mitigate the harm to birdlife by imposing appropriate conditions and restrictions on the operation of the turbines.")

Here, private parties filed suit against BLM to require it to comply with state substantive environmental standards. However, it is the state agency that is charged with bringing such an action. See FPL Group, 166 Cal. App. at 1367. Accordingly, Plaintiffs have not shown that BLM failed to

1    comply with the ROW pursuant to 43 U.S.C. § 1765(a)(iv).

2        2.    **Failure to Comply with 43 U.S.C. § 1765(a)(ii)**

3        Plaintiffs argue that the ROW must also contain terms and conditions which will minimize

4    damage to fish and wildlife habitat and to include measures that will avoid killing protected wildlife.

5    Specifically, they assert that the failure to requirement curtailment of wind turbines to minimize the

6    Project's killing of red-tailed hawks, Swainson's hawks, burrowing owls and other raptors fails to

7    minimize damage to wildlife habitat and protect the environment.  Moreover, failure to continue

8    turbine curtailment of golden eagles for 20 years of the Project also fails to minimize damage to

9    wildlife habitat.

10       Federal Defendants contend the ROW contains terms and conditions that are in compliance

11   with FLPMA as the Eagle Plan and ABPP contain measures to protect birds.  Ocotillo Defendants

12   argue that BLM in consultation with USFWS and CDFG, carefully considered the need for mitigation

13   measures for birds and formulated requirements that satisfy FLPMA.

14       BLM, with USFWS and CDFG, oversaw the development of the ECP and APBB.  (OWEF

15   1154; 1651) (CDFG consultation).  The ROW made the creation and compliance of the ABPP and

16   other mitigation measures a mandatory condition of its ROW.  (OWEF 470 (¶ 26.); (OWEF 466);

17   (OWEF 2661-2662) (mitigation monitoring and reporting requirements).  The mitigation monitoring

18   and reporting requirements provide that "The Bird and Bat Conservation Strategy will describe

19   proposed OWEF design features and advanced conservation practices to be used to minimize the risk

20   of collision pre-construction, during construction, and during O&M. The plan will include monitoring,

21   adaptive management, and reporting procedures.  The post-construction monitoring methods will be

22   based on the California Guidelines for Reducing Impacts to Birds and Bats from Wind Energy

23   Development (CEC 2007)."  (OWEF 2662.)  The ROD concludes the Project "provides the most

24   public benefit, while also avoiding to the greatest extent practicable potential impacts on biological,

25   cultural, visual and other resources." (OWEF 126.)

26       As to the golden eagle, under the ECP, based on data and calculations, the ECP concluded that

27   gold eagles were rarely present at the OWEF site and therefore golden eagle collision risk without

28   curtailment was less than once per year.  (OWEF 3192.)  Based on this risk, Ocotillo is implementing

an intensive monitoring and research program and curtailment program using a highly advanced radar to detect a golden eagle flying within the Project site. (OWEF 3192.) Although a biologist is guaranteed to be onsite monitoring for golden eagles for ten years, a BLM authorized officer, advised by a Technical Advisory Committee, will constantly review data generated throughout the life of the Project and evaluate whether further mitigation measures are necessary. (OWEF 3202-05.) Moreover, the radar used to detect the golden eagles will operate for the life of the Project. (OWEF 3319.)

While Plaintiffs argue that the ROW must contain provision to prohibit any taking or killings of protected avian species, they do not provide any authority that is the standard in California. As discussed above, mitigation measures were implemented to minimize damage to wildlife habitat. The Court concludes that BLM did not act arbitrarily or capriciously by failing to include turbine curtailment as to the red-tailed hawk, Swainson's hawks, burrowing owls and other raptors in violation of 43 U.S.C. 1765(a)(ii).

**3.      Duty to Avoid and Mitigate Environmental Impacts on Class L Lands**

Plaintiffs argue that the BLM violated FLPMA by approving a ROW that is inconsistent with the CDCA Plan's Class L land use designation. The CDCA Plan prohibits project that will significantly diminish or degrade sensitive natural, scenic and cultural value and permit "lower-intensity" uses "while ensuring that sensitive values are not significantly diminished."

Federal Defendants argue that the Project conforms to the CDCA Plan because wind energy facilities are allowed on Class L lands and the Project will not "significantly diminish or degrade" resource values and mitigation measures to lesson and/or avoid impacts are key to the Project.

Ocotillo Defendants contend that energy development is proper under Class L lands as long as the requirements are met which include minimizing unnecessary impacts. The Plan Elements and Plan Amendment Process and the use limitations in the Plan's guidelines demonstrate that the Project is in compliance with the CDCA Plan.

The Federal Land Policy and Management Act of 1976 ("FLPMA"), codified at 43 U.S.C. § 1701 *et seq.*,  governs the BLM's management and land use planning of federal public lands. 43 U.S.C. § 1701(a). The FLPMA provides that the management of public lands be based on "multiple

[12cv1281-GPC(PCL)]

use and sustained yield." 43 U.S.C. §§ 1701(7); 1732. Multiple use is defined as "the management of public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people . . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources . . . ." 43 U.S.C. § 1702(c). Sustained yield is defined as achieving and maintaining "in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." 43 U.S.C. § 1702(h).

Within FLPMA, Congress also established the California Desert Conservation Area ("CDCA") to "provide for the immediate and future protection and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of environmental quality." 43 U.S.C. § 1781(b). The 25 million acre CDCA includes over 12 million acres of public lands. (OWEF 5914.) Pursuant to the direction provided in the FLPMA, in 1980, the BLM developed the California Desert Conservation Area Plan ("CDCA Plan") to manage the public lands within the CDCA. 43 U.S.C. § 1781(d); (see also OWEF 5905). As part of the CDCA Plan, Congress directed the Interior to take "into account the principles of multiple use and sustained yield in providing for resource use and development, including, but not limited to, maintenance of environmental quality, rights-of-way, and mineral development." 43 U.S.C. § 1781(d).

The CDCA Plan divides lands in the CDCA under BLM management into four multiple-use classes. (OWEF 5920.) The classes are: Multiple-Use Class ("MUC") C (controlled use), Multiple-Use Class L (limited use); Multiple-Use Class M (moderate use); and Multiple-Use Class I (intensive use). (Id.; OWEF 5928.) It is undisputed that OWEF is situated on Multiple Use Class L lands.

Class L "protects sensitive, natural, scenic, ecological, and cultural resource values. Public lands designated as Class L are managed to provide for generally lower-intensity, carefully controlled multiple use of resources, while ensuring that sensitive values are not significantly diminished." (OWEF 5920.) Under the Plan Elements[10], Class L is where "judgment is called for in allowing consumptive uses only up to the point that sensitive natural and cultural values might be degraded."

---

[10]The Plan Elements provide "more specific application, or interpretation, of multiple-use class guidelines for a given resource and its associated activities." (OWEF 5928.)

[12cv1281-GPC(PCL)]

1   (OWEF 5928.)  Under the multiple-use guidelines, Class L lands allows for wind/solar use "after

2   NEPA requirements are met."  (OWEF 5922.)

3         Plaintiffs allege that BLM's discretion is limited to "allowing consumptive uses only up to the

4   point that sensitive natural and cultural values might be degraded."  (OWEF 5928.)  In addition, the

5   Wildlife Element directs BLM to "[a]void, mitigate or compensate for impacts of conflicting uses on

6   wildlife populations and habitats."  (OWEF 5935.)  They argue that BLM has failed to apply a

7   curtailment condition as mitigation for impacts to raptors and owls for the life of the Project.  Plaintiffs

8   also allege that the foraging habitat of the golden eagle, prairie falcon, Swainson's and other sensitive

9   species of hawks and burrowing owl will be degraded by the presence of 112 turbines.

10        The ROD for the CDCA Plan contemplates wind, solar and geothermal power plants and

11  recognizes that "[p]ower plants of any kind may be incompatible with Class L.  However, the

12  recommended decision provides that the guidelines be kept as to allow the power plants if

13  environmentally acceptable.  Appropriate environmental safeguards can be applied to individual

14  project proposals which clearly must be situated where the particular energy resource are favorable."

15  (OWEF 5759.)  Under the Plan Element of Energy Production and Utility Corridors, it states that one

16  of its goals is to [i]dentify potential sites for geothermal development, wind energy parks, and

17  powerplants."  (OWEF 6000.)  The Plan Element also states that "[s]ites associated with power

18  generation or transmission not identified in the Plan will be considered through the Plan Amendment

19  process."  (OWEF 6002.)  The CDCA Plan recognized and expected that new energy technology

20  would develop in the future which would include solar and wind energy programs.  (OWEF 6002.)

21  It also contemplates a plan amendment procedure to allow these programs.  (OWEF 6002) ("A Plan

22  Amendment will be required for fossil-fuel and nuclear powerplants proposed in a Class L area.")

23        The final EIS notes that even after implementation of all mitigation measures, there would

24  "unavoidable adverse impacts" on Wildlife Resources.  (OWEF 840.)  "Construction and O&M

25  activities would result in temporary and permanent unavoidable impacts to suitable (unoccupied) PBS

26  habitat, burrowing owl burrows and foraging habitat, special status raptor and migratory bird species

27  (collision), and special status bat species due to collision."  (OWEF 840.)

28        The FLPMA and the CDCA require a careful balancing between multiple use and sustained

yield management planning with protecting the quality of "historical, scenic archaeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." See 43 U.S.C. § 1781.  The ROD for the Project states that the BLM conducted a careful balancing of the importance of the OWEF to help California achieve its renewable portfolio standard and green house gas reduction objectives and to implement the Energy Policy Act against the importance of preserving the environmental and cultural resources found on those lands that would affected. (OWEF 109-110.) The final EIS states that the Mitigation Monitoring Program will "avoid or substantially reduce adverse impacts." (OWEF 832.)  The ROD established mitigation measures to limit the impact of the project. (OWEF 421-455; see also OWEF 20498-530 (Burrowing Owl Migration and Monitoring Plan); 723-799 (Golden Eagle Conservation Plan); 2922-3008 (ABPP).  Mitigation measures to lessen and/or avoid impacts to resources are a cornerstone of the OWEF's ROW grant.

Plaintiffs seek a curtailment as a mitigation measure for all raptors but FLPMA does not require such a result.  Based on a review of the administrative record, the Court concludes that the BLM did not act arbitrarily, capriciously or abuse its discretion by approving the ROW.

**G.     Remaining Claims**

All Defendants argue that Plaintiffs have forfeited claims in the first amended complaint and not addressed in their motion for summary judgment.  Plaintiffs have not sought summary judgment as to their BGEPA claim and their NEPA arguments as to BLM's alleged failure to 1) adequately describe the affected environment; 2) adequately evaluate direct and indirect cumulative impacts; and 3) evaluate the cumulative effects of the Project.  (Dkt. No. 28, FAC ¶¶ 44(a), (b), & (c).)   As to FLPMA, Plaintiffs also do not raise any arguments related to BLM's alleged failure to 1) conduct an adequate inventory of the resources on the Project Area; 2) prevent unnecessary or undue degradation; 3) use a "systematic" approach to land use planning or plan amendment; 4) comply with state standards for public health and safety; and 5) minimize the size of the ROW grant to the area actually occupied by the Project.  (Dkt. No. 28, FAC ¶¶ 50(a), (b), (d), (e), and (g).)   Ocotillo also point out that Plaintiffs' motion for summary judgment fail to raise arguments for relief as to the fourth claim under California Business and Professions Code section 17200.  Plaintiffs do not oppose or address this issue in their opposition.

[12cv1281-GPC(PCL)]

Since Plaintiffs have failed to raise these issues in their motion for summary judgment and do not oppose or address this issue, these claims should be considered abandoned.  See City of Santa Clarita v. U.S. Dept. of Interior, No. CV02-697 DT(FMOx), 2006 WL 4743970, *11 (C.D. Cal. Jan. 30, 2006 (citing Mountain States Legal Found v. Espy, 833 F. Supp. 808, 813 n., 5 (D. Idaho 1993) (in light of fact that defendants have moved for summary judgment and the matter is to be resolved by dispositive motion without a trial, claims not raised in summary judgment were abandoned and judgment entered in favor of defendants.))

Accordingly, the Court GRANTS Defendants' motion for summary judgment as to the cause of action under BGEPA; California Business and Professions Code section 17200; the NEPA allegations as to the BLM's alleged failure to 1) adequately describe the affected environment; 2) adequately evaluate direct and indirect cumulative impacts; and 3) evaluate the cumulative effects of the Project,  (Dkt. No. 28, FAC ¶¶ 44(a), (b), & (c)); and the FLPMA claims as to the BLM's alleged failure to 1) conduct an adequate inventory of the resources on the Project Area; 2) prevent unnecessary or undue degradation; 3) use a "systematic" approach to land use planning or plan amendment; 4) comply with state standards for public health and safety; and 5) minimize the size of the ROW grant to the area actually occupied by the Project. (Dkt. No. 28, FAC ¶¶ 50(a), (b), (d), (e), and (g).)

### Conclusion

Based on the above, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Federal Defendants' and Ocotillo Defendants' motion for summary judgment as to all causes of action in the first amended complaint.  The Court DENIES Plaintiffs' motion for leave to file an amended complaint.  The Court also DISMISSES Plaintiffs LIUNA and Hector Casillas for lack of standing.

IT IS SO ORDERED.

DATED:  February 27, 2013

HON. GONZALO P. CURIEL
United States District Judge

- 35 -                                   [12cv1281-GPC(PCL)]